U.S. Embassy in the Philippines  Good morning and welcome to the 9th Circuit Court of Appeals in Pasadena. I wish we had better weather for you all. I'm sorry about that. This is the time set for our argument in Apache Stronghold v. United States of America. Before we proceed, I just want to check. Judge Gould is appearing by video. Judge Gould, can you hear me? Yes, I can hear you. Good morning. I believe we're ready to proceed. So, if you'd like to begin, the lawyers for Apache Stronghold may begin. Thank you, Your Honor. May it please the Court, I'm Ben Friderich on behalf of Apache Stronghold. I'll be aiming to reserve about six minutes for rebuttal. To answer the substantial burden question in this case, it helps to start with a very important point on which both parties agree. Both parties agree that if the United States government put up no trespassing signs and threatened the Apaches with fines for accessing Oak Flat, that would be a substantial burden. Can I ask a question about that, though? I mean, that goes more to the discrimination case, wouldn't it? If they said the Apaches couldn't come on the property, but anybody else could, that would be a clear violation. In our view, either way, a discriminatory ban or a discriminatory ban on access or a blanket ban on access would be a substantial burden. I haven't been able to get a clear answer from the government on that. But under RFRA, RFRA says you can't impose a substantial burden, even if it results from a generally applicable law. So if a trespassing fine counts as a substantial burden under RFRA, RFRA instructs this court that it counts as a burden, whether it's a generally applicable rule or an argument within the prior case law or the prior rule we adopted in Navajo Nation where you would be imposing a penalty for trying to exercise. So that seems different than what we're addressing here. I mean, I don't mean it's just positive in the case, but it's just an unusual hypothetical to come up with. Can I ask a question out of the gate where we are on the FEIS? So as I understand it, the government withdrew that. Maybe I should ask them, but I assume you would know. They withdrew it in 2021. I don't think a new one had been adopted. As of the opinion in 2022, has the government come forward with a new FEIS? No. Two years ago they said they would renegotiate consultation, and it would be a matter of months, but they still haven't published it. Does that do anything to our ability to decide this case? Are you asking to enjoin the transfer, or are you asking to enjoin the building of the mine? We're here on a preliminary injunction only, and we're asking to enjoin the transfer. The transfer can't occur until the FEIS is completed. It will occur. It must occur within 60 days after the FEIS is completed, and the government has represented that that will be republished in a matter of months. Well, they represented that two years ago too. My guess is they're just waiting for a decision in this case before they decide to move forward. So I started with the fines, because that's where we all agree. A fine is a potential burden. But here the government is doing something far worse, not just threatening fines, but authorizing the complete physical destruction of Oak Flat, barring the Apaches from ever accessing it again, and ending their core religious exercises forever. Counsel, how is that different from building the road in Ling versus Northwest? Sure. The Supreme Court in Ling emphasized that the plaintiffs there continued to have access to every site where they engaged in religious practices and could engage in the same religious practices they engaged in before. The plaintiffs there complained that the road that was at least a half-mile away would, quote, diminish the sacredness of the area. And the Supreme Court said that if there were a law that restricted the Native American respondents from visiting the site or accessing it, that would be a different case. Yeah, a different case with a hypothetical which they didn't answer. Sure, but it drew a distinction. I think that distinction, going back to your original hypothetical, is one on discrimination, not a different case. Here's the problem. Under the First Amendment, you seem to have a pretty uphill battle because of the Ling case. It seems like your best argument is you've argued that RFRA expands and goes beyond the First Amendment. Is that an accurate recitation of your argument? I don't understand. Ling, Justice O'Connor and the majority specifically said, like, we're not going to get into these line-drawing exercises under the First Amendment. So why should substantial burden be interpreted differently under RFRA than it is under the First Amendment? Well, the Supreme Court has expressly held in Hagee Lobby that RFRA goes beyond what the First Amendment requires. As to who can sue, not what can be sued about. But also the whole point of Smith. The First Amendment, Smith, says if the government is acting neutrally and with a generally applicable law, it doesn't matter how severe the burden is, you don't get the strict scrutiny. And that's precisely what Congress overturned by enacting RFRA and said it doesn't matter if the burden is imposed through a generally applicable law. If it's a substantial burden, you still impose strict scrutiny. And that goes beyond what the Supreme Court has interpreted the free exercise clause. Was Ling actually a substantial burden test? Did he use the term substantial burden? No, never used the term. And Ling was in it. Employment Division versus Smith was essentially characterized as a case about neutrality. Yes. And it was rejected, Employment Division versus Smith, specifically rejected the characterization of Ling as being about internal governmental affairs. Correct. So it was really a predecessor to Smith. It was really maybe the strongest case that Smith relied upon for his neutrality rule. And it was really about the neutrality principle. Yes. Is that right? Yes. Sure. So your intention to distinguish it because of the nature of the intrusion is really beside the point, isn't it? In other words, the fact that it arose rather than a complete destruction was really not what Ling was about. It did assume that it was a very severe restriction, but it isn't what the case was about. Correct. I think there's two different grounds on which you can distinguish Ling. One is the legal ground you mentioned. Ling in the First Amendment case, it emphasized the First Amendment text of prohibit and it emphasized multiple times that the burden was just incidental, meaning it's not a neutral law. And that's what Employment Division versus Smith said it was. Yes, exactly. And that's what Trinity Lutheran said it was, and that's what multiple cases have characterized it as back under the First Amendment were distinguishing between neutral and generally applicable laws and laws that are targeted. And that's what Employment Division versus Smith said specifically about Ling, not just in general. Yes, exactly. So that's a clear basis on which to distinguish Ling. No, it's not a question to distinguish. I hate the word distinguish. You don't distinguish anything from anything. But it's a fundamentally different way of approaching the analysis because it was the one that was later made more specific in Employment Division versus Smith and was definitely overwritten by Rickford. Yes, it's applying a different legal test than Rickford demands the court to apply. So, counsel, under your view of the statute, what would you say would happen in this situation? You have government land and you have two religious groups, and both of them claim that particular land is sacred to them and that letting anyone but their religious group on this land forever profanes it and destroys their ability to practice their religion. So in that kind of a circumstance where two groups are saying that, what should the government do? Yes, this is a very common occurrence in prison where two groups want access to the same meeting room at the same time. One wants to exclude the other. And I think you can handle it the same way. If the argument is just having another entity there desecrates the site or is a sacrilege, then you're in Bowen versus Roy land. This is offensive to me or it robs the spirit. But if it's a matter of access, if one group can't be there when the other is there, or just like in a prison meeting room, if you're a Sunni Muslim and you can't have Christians or Jews invading your Juma service, the prison system can ration access to the meeting room based on different times and different needs in the same way here. The government property, would government be required to do that? Quite possibly. There are cases holding that the government is required to do that on government property in prison, in a prison context. And I think the same logic would apply here. It would depend very much, though, on the nature of the access desired and required and what the government was doing. That analysis would occur at the compelling interest stage. That's not really a question about what's a substantial burden. It could be very much easily handled at the eastern scrutiny stage. You can imagine it coming up at the substantial burden stage as well. If the plaintiffs are saying, what are your facts? Substantial burden stage is the tribe or whoever it is says, this is how it's burdening my religion. And the other one says, this is how it's burdening my religion. And then you decide whether it's a substantial burden. Then you go on. I mean, that's not the end of the story. That's correct. And there was actually a 10th Circuit case. The name escapes me, but it was two different tribes had a disagreement over taking yellow bears, not yellow bear. Two different tribes had a dispute over taking eagles off a reservation. One tribe said, we need to take the eagles. The other tribe said, you can't take the eagles. And the 10th Circuit resolved it. I think it was on strict scrutiny grounds. So you can certainly take that. Mr. Edwards, if we agree with you that substantial burden is not a term of art, how should we define substantial burden? Well, this Court has already defined substantial burden in the Arlupa, the parallel Arlupa religious land use institutionalized persons context in the San Jose Christian College case as a significantly great onus or restriction on religious exercise, adopting the plain meaning. That would work perfectly well here. And then Judge Berzon, I think, in her dissenting opinion, applied it to this context saying if the government controls a necessary religious resource, it controls access to a necessary religious resource, and it completely bars access or destroys the resource, that counts as a substantial burden. And I asked about this. Are there any RFRA or Arlupa cases that address religious use on government property? Because I couldn't really find any. Comanche Nation is an example of that. Where did that come from? That came from Oklahoma, Federal District Court in Oklahoma. The Comanches, in their religious practice, they stood in a specific spot and centered themselves on medicine bluffs. And the Army proposed building a warehouse on the exact spot the agent was enjoying, the warehouse was enjoying. Yes, the court issued a preliminary injunction saying that was an obvious substantial burden, physically obstructing their ability to access the site where they carried out their religious practice. And then the government couldn't satisfy such a treaty. That case was 15 years ago in the Tenth Circuit. No other district court or Tenth Circuit opinion has gone the other way. And you have a test run of 15 years of precedent in the Tenth Circuit. Not in the Tenth Circuit, though. You have 15 years, and the government hasn't pointed to a single case. It didn't go up to the Tenth Circuit. The government didn't pick that one up. No, the government decided it could get by by building a warehouse elsewhere and saying we need to challenge that. Section 3003, you characterized it in your briefs as a land exchange mandate. That's how it's also characterized in the complaint. And that seems to be the centerpiece of what it requires. But if RFRA applies, it seems, and you're asking for the land exchange to be barred, the very thing that the whole purpose of 3003 is, why isn't that a sufficient conflict to trigger Marcello's sort of get-around of express reference requirements that Congress is not subject to magic words requirements? That's true. A couple points on that. So RFRA expressly contemplates the situation and provides that it applies to later enacted statutes, unless the later enacted law exempts itself from RFRA's application by expressly mentioning RFRA. And nobody argues that Section 3003 does that here. So the APA and Marcello, too. And yet the court found that it was overwritten. So we're all in agreement that RFRA's text would say it applies to 3003. So the only way that you can get around the application of RFRA's text would be to say that that sort of an express reference provision is unconstitutional and unenforceable. And that would go against 30 years of precedent under RFRA. No court has ever done that. It would specifically go against the Supreme Court and Hobby Lobby and Little Sisters of the Poor, two cases, expressly applied RFRA to a later enacted law and expressly cited and relied on RFRA's express reference provision. It could have said, oh, the Affordable Care Act is not a clear conflict. They're reconcilable, so we're going to apply it. That's not what it said. It said there's an express reference provision. The Affordable Care Act did not expressly reference RFRA, so we must apply RFRA to a later enacted statute. And the government will evade this argument in the discussion before the panel. There's a little footnote that sort of says something in passing, but is there a way or a problem here as to this argument as an independent argument? I mean, it comes up in context as an independent argument. Is there a way or a problem? There was no mention of this argument anywhere in the government. We set a footnote at the panel stage, and then they tried to expand on it at the re-hearing stage. So I think it is weighed, but it's also just meritless for the fact that the Supreme Court, you know, you would be going in the teeth of two Supreme Court decisions, citing and applying the express reference provision to strike that down. And there's not any reason to do so. This is not a provision that binds successor Congresses, like you need a 75% vote or something like that. All Congress needs to do is one. It effectively turned 3003 into a novelty. In other words, on the page, and it basically goes away. Not at all. You can read them together as Section 3003 saying, you know, transfer this land subject to RFRA, and if you can't satisfy search scrutiny under RFRA, you've got to follow RFRA. So you can apply the two statutes together. It's just that Congress understood that this would be subject to analysis under RFRA. And it's not like Congress can't, you know, enact that law. They have considered multiple statutes that wouldn't expressly exempt the statute from RFRA. The Equality Act is just one example. So it's not even a case where it truly binds the hands of Congress. The government incursion here is quite extreme. Suppose the incursion was less extreme, and so instead certain plants that are deemed sacred are cut down. Would that be a substantial burden under RFRA under your reading of it? The answer would be likely. And I'd point out that the phenomenon you raised is not unique to this case or our position. It occurs in prison cases all the time. It occurs in our land use cases all the time where the government may restrict some religious practices,  but they didn't restrict the wearing of a kufi cap or praying, like partial restrictions in our land use cases. There's often a case where the government denies a conditional use permit to expand your church building, and you can only get, you know, 25% or 50% of what you ask for and not 100%. And in all those cases, of course, engage in the same type of three-step analysis. One, you identify the religious exercise. What is it? I mean, you identify in what way the government has restricted that, and is it substantial? It's not just the word substantial. It's a substantial burden, too. And we have all this. I've been wondering about this because there's all this law that says that you don't really make judgments about how important the religious exercise is because that's up to the person. So how would a court find a burden not substantial? It is a burden. Sure. One example would be a truly de minimis fine. So take the Hagi Labi case as an example. This is where our clients objected to including certain forms of helping. But in this context, for example, in the land use context, if there was, I mean, would you say that an abomination was a substantial burden? Could we have said that? All I'm getting at is there was some concern about the snow, but they can still go there and they can still do it after they want to and so on. Right. But perhaps one of the plaintiffs there objected even if the government allowed pure water to be used as snow, maybe that would be insubstantial. A good example here would be, say, the government said, look, we're having a lot of use at Oak Flat. We need to have an application process just so we know who's going to go there and when and make sure there's no conflicts. So if I have an application before you, it's going to be insubstantial. Sorry, if I genuinely believe that if you put pure snow on top of the mountain, I'm going to go to hell, why is that an insubstantial burden? I would let science decide. I'm sorry, I'm going to let science decide. I'm pretty sure the view was that putting this wastewater snow on the mountain was actually, and I know a little bit about this because I actually did a project with this back in the construction days in Montana, and the idea was that you actually had treated the water, but obviously the Native Americans thought differently, right? They thought it was basically dripping all over the mountain, right? And so, you know, somebody's going to be saying, well, yeah, you may think that, but it's not really happening so it's not substantial. I'm trying to figure out, and the reason I'm asking this is because you make a, I'm actually surprised you make a big deal out of the fact that, you know, there's a lot of physical destruction going on here, and how does that, like, if you actually think having your name printed on a Social Security card is going to send you to hell, that's a substantial burden, right? I'm surprised that you would try to say it has to do with how much physical destruction or how much it physically affects. Is there any chance that you would make that argument in other cases? Well, in versus Roy, the good example of the Social Security card where the plaintiff said, if the government uses a number for my daughter, that will rob my daughter's spirit. In this court, in other cases, it's a substantial burden. Not in versus Roy, it's a substantial burden. The thing is, it's just not the kind of burden that under voting versus Roy is cognizable under the First Amendment. So that gets me to, like, would you agree that not all burdens are cognizable under RFRA? Yes. Right. So, like, if you own a piece of land and I own a piece of land beside each other, and God tells me I need to build my church on your land, then that's a substantial burden. I'm going to go to hell if I don't build my church on your land. But it's not the kind of substantial burden that's cognizable under RFRA. Would you agree? I agree with that. I agree with the government on how you own that land. And God tells me that I need to build my church on your land. Is it your view that that would be a substantial burden because the government owns the land and the government refuses to sell it? That's all their discretion is telling people to have. I don't think there would be a substantial burden there. And the reason is that you would say that it was a compelling interest. It's a very hard problem because a substantial burden question, as Judge Nelson says, runs into this problem of self-definition of religious interests. And I'm not sure it's the right rubric for making these decisions. I'd love to help you out with that. So the Hobby Lobby example, the plaintiff says, if we include these drugs in our health insurance plan, that will make us complicit in abortion and violate our religion. And the government said, no, that's too attenuated. And the Supreme Court said, we can't dig into that religious theory of complicity. That's a religious belief. That's a religious question. We have to take that as a given. But the burden was not the complicity. The burden was the fine, the multimillion-dollar fines that they faced. That's an objective burden that a court can assess and weigh and determine if it's substantial if you go to jail or if there's physical punishment. That's exactly the rule that Yoder put forward, right? Yoder did mention subjective. Is it mentioned in RFRA? Yes. But it is not mentioned in RLUPA? That's correct. Thank you very much. So if you draw that distinction between identifying the religious exercise, which can be subjective or a purely religious question, you know, you robbed my spirit or something like that, RFRA calls on you as a court to assess if the burden is substantial or not. There has to be something that a court can assess. If it's a fine, that would count. If it's a physical restraint, if the government actually arrested the plaintiffs and wouldn't allow them to go on to a plaque, physical restraint is an objective burden you can assess. And then fencing off and swallowing the craters so you can never go there again, that is something objective that you can assess as well. I think what you're saying is that if it's a purely spiritual, what you call subjective, it doesn't count. But it has to have some physical component. That's discriminating between religions that are, say, Native Americans have a more land-based religion that's more tied to physical, tangible things versus some religion that's tied that's not physical or tangible. It seems to me like that's a really odd distinction to draw between saying something's only substantial, only counts as a substantial burden if it has some physical coercive component. Doesn't it make more sense to say we already know that there are certain burdens that are cognizable under RFRA and certain that aren't, right? And that RFRA was meant to deal with certain kind of burdens where the government is sort of coercing some sort of activity. In other words, when the government doesn't come in and force me to give my land to you, that's not going to really deem that to be the government. Sure, maybe the government, you could characterize that as a burden. The government's not willing to help you out with your religion, but it's not a burden they're imposing on you. And I think with that, so there's two things we're circling around here. One is whether the burden is something that a court can objectively measure or whether it would require a court to answer a religious question. That's Bowen versus Roy. The second thing we're circling around is you're saying that when the court can't measure a religious burden, it doesn't count as a burden. I thought we just took the folks' word for it. Correct. You take their word for what their religious exercise is, but when the statute instructs you to assess whether the burden on that is substantial or not, there has to be some objective burden that you can measure. You say you're going to go to hell if you put our name on your card. Now, is that the kind of burden that is actually covered by either the First Amendment or under RFRA? And you say, no, that's just not the kind of burden that's covered. It's very substantial. I'm sorry you're going to hell, but it's not the kind of burden. Because seriously, there are people who might say there could be burdens that could be very substantial but aren't covered. That's Bowen versus Roy. I said it was Bowen. It's a substantial burden case, actually. I mean, it was Bowen about his burden, or, again, was it another of the line of cases that culminated in an employment division versus Smith that said neutral rules don't count. You're correct. It didn't use the term substantial burden. That was part of that line of cases. If I can get to the second thing we're circling around, which is the term burden is a relative term. It's the idea that the government is making you worse off in some way than you were before. And in order to make that assessment, you have to have a baseline from which to judge whether there's a burden. For example, if I'm Orthodox Jewish and I say my religion requires me to consume a kosher diet, I want you, the government, to give me money or give me a kosher diet so I can observe my religious practice. And the government says, no, is that a substantial burden? No, the government has not made you any worse off than you were before. And the reason is because there's a background of coercion in religious cases, but they don't have to do it when a Jewish person goes up to who's not in prison. So why doesn't that cut against your attempt to try to pull in all these reluctant cases? Because it's one thing to say people that are in prison, the government has to actually facilitate their religion. That makes sense. They have to give them a kosher meal, but they don't have to give people who aren't in prison a kosher meal. Correct. So why do they have to give them a piece of land? They don't have to give them a piece of land, but the baseline here, you need to figure out what the baseline is from which you're judging the burden. You could take the original baseline of this was Apache land and the government took it by force. Set that aside for a minute. The current baseline, as we see here today, the Apaches have a right to go onto Oak Flat to access it and use it for their religious purposes. They've enjoyed that right by law and custom. It is protected by executive order and statute. So would you draw a distinction between if somebody says, well, we've been worshiping in this government, you know, in the mall on weekends. We've been worshiping, so we sort of have it. They can get like a vesta, right? But if I'm somebody who has a genuine religious need to worship on the mall in D.C., right, but I haven't done it yet, you would distinguish between those two things. I don't see where that's in the language. You're basically just discriminating in favor of established religions with established practices against new religions. Well, I thought you disagreed with me on the kosher diet in prison, right? There is a baseline that it wouldn't be a burden if I said, government, give me money to have a kosher diet and there's a way for you and I to actually feed you in prison, right? Right. So there's a need to, but that's not true on the mall. Well, you still, no matter what the case, you have to assess what the baseline is from which you're judging the burden. So the mall case, you could deal with it on strict scrutiny, as Judge Berzon has said, but you could also deal with it by the textual word burden, but it's a relative term and you must judge whether the government has made you worse off in some respect than the judgment on the court made. So it's not some temperament because the government made you, so it's a count when the government basically just does its own thing and you happen to be on somebody's side. Is the government actually imposing on you? Are they making you worse off or are you just worse off because you didn't get a kosher meal? Did the government, by not giving you a kosher meal, make you worse off or are you just worse off because you didn't get a kosher meal, period, right, when you're not in prison? Yes. I would like to reserve two minutes for rebuttal, but I think we may be in vehement agreement because here the government has made the Apaches worse off as they sit here today. They have a right to go on to Oak Flat to access it and use it for their living purposes. This is a case about a transfer. If they kept the land and the government itself blew it up and made it impossible to access, that would be one thing, but it's the government's land but they're going to give it over to somebody else so it's no longer the government's land. That makes it a more difficult case, it seems to me, in terms of talking about both baselines and burdens. What about that? The government has said that if the government takes away a vested property right, that that counts as a substantial burden. That's why we pointed out that we have a vested property right here. What does that say? There's a use right. I wondered about that. You made a separate argument that this is being held in trust. If we don't adopt that argument that it's held in trust, do you think there's still some other vested right other than just the trust relationship that we could distinguish this case from the myriad of other cases that could be brought in as well? Yes, Your Honor. I don't think you have to rely on that, but there is a use right that's protected by Executive Order 13.007 and FLTMA, and the government is taking that away when it transfers the land. If it transfers the land subject to a use right, to an easement and preserved access forever, that would be a different case. Here, the only purpose is destruction, and that is a right to reserve. If we agree with you, I'll give you extra time for it. If we agree that the destruction of Oak Flats is a substantial burden under RFRA, should we remand to the district court to determine whether there's compelling interest and to decide the remaining winter factors, or do we make that determination? I'd like to get your position. Sure. I'd give a different answer on the compelling interest and the winter factors. So we're here on a preliminary injunction that's been fully briefed. The government has made no argument on the compelling interest side of the statute, and so it is waived that for purposes of preliminary injunction. We go to summary judgment, permanent injunction, and may have an opportunity to make that argument on remand. But here on the preliminary injunction, no argument. That's waived. We have established a likelihood of success on the merits. The winter factors, you know, Jeff Verzon and our dissent mentioned the district court didn't address those factors, but they have been fully and exhaustively briefed by the parties here. It's a very easy question, and we would urge the court to decide that here and instruct the district court to grant the preliminary injunction. Thank you, Eric. Thank you. Let me take a break before you step aside. Let me ask Judge Gould, do you have any questions for Mr. Goodrich? If you don't second, I will ask Mr. Goodrich if there's a treaty right. Your Honor, the 1890 treaty that barred the land exchange. Yes, Your Honor, we have argued that the 1852 treaty made a promise to the Apaches to legislate for their prosperity and well-being on their territory, that this was undisputedly originally Apache land, and that destroying it violates the terms of that treaty. But also the treaty would fill in where the government concedes that even a quasi-property right counts as taking that away, counts as a substantial burden. We have at least that here. Thank you. Thank you. Good morning, Your Honor. Great to see the court. I'm Stephanie Barclay from the Notre Dame Law School's Religious Liberty Clinic, representing AMICI, the National Congress of American Indians, an Apache tribal elder, and other Native American cultural rights organizations. Today I'd like to briefly discuss three arguments. First, this court should revisit its troubling rule under Navajo Nation. Second, the land writer did not displace RFRA. And third, it is government, rather than private action in this case, that imposes a substantial burden on the religious exercise of the Apache people. Turning to the first argument, we agree with the test set out from Judge Brumacain that the appellant discussed that we focus on the objective level of government interference with the religious exercise. And Judge Van Dyke, some of the questions you were asking about baseline and how we think about that, I think it's also worth considering the perverse incentives and effects that would result if the two-category approach of Navajo Nation really was the universe of claims, even outside of the prison context elsewhere. That means that in a case like yours. I hear your position that Navajo Nation is just limited. The question I'm struggling with is, obviously, if it doesn't cover some verdict, right? I mean, we know it doesn't cover some verdict. So why do we think that it covers when the government is making a choice to do something with its own land that has an incidental effect? So to give you one example, let's say God tells me I need to be buried in Arlington Cemetery in order to go to heaven, right? And it's just assumed that that's a genuine need of mine, and it's very substantial, because I will not go to heaven if I don't get buried there. Then I guess your view would be that then we have to analyze that under compelling interest, that that's subject to strict scrutiny of the government's ability to say, no, we're not going to let you be buried in Arlington Cemetery. If there's a sincere religious belief that the claimants must be buried there or else they're going to help, you might have to analyze that under compelling interest. The government has done so in cases like Comanche Nation and the Pink Circuit and also Medina v. Higginson, another case. So you agree that, I said essentially with the government, that if we adopted your test, that land use decisions of the government would be subjected or would be subject to the review from tens of millions of people. Land use decisions the government has already conceded are subject to review. A decision like this to alienate property would be subject to the review of millions of people. Not necessarily, Your Honor, because remember the government can exempt its land use legislation from referral. It did not do so here. So the government in the market interest might argue. That's your example. I mean, there is a baseline problem in the hypothetical, as your colleague was saying. I mean, in the hypothetical, this person had no access to Arlington's Secretary. Nobody had access. The general rule was nobody has access unless they are allowed to have access. And here we have a situation where I gather anybody has access, including this group, and now when they're trying to undo that, isn't that a difference? The court could look at the baseline in that way and say that no one was made worse off. My point is that strict screening is also a way to deal with this. The government is exempting government action through this specific reference provision of referral. And here the government could have referenced that explicit reference position. It did not do so. As Judge Seitz recognized in the Seventh Circuit, that doesn't mean that you have a current Congress binding future Congresses. She said that it's simply telling the future Congress how to go about making clear that it's not going to be subject to reference. Let's see. Senator Britt, what's your view on reporting? It wasn't asked for in some of the cases. They are arguing on the other side that there was a clear statement rule about an EFR. The other side, the APA, for example, it doesn't have an explicit reference provision. It is that you have to reference. The Supreme Court has already spoken favorably and relied on that reference provision in two cases. And in addition, there is a strong canon of interpretation against the implied repeal. The APA provisions said no subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly. And the INA made no express reference to the APA and yet was bound to displace it on the grounds that it just was simply irreconcilable and one Congress cannot bind the later Congress to use magic words. Judge Knight said that it's not binding a future Congress to just say you're referencing RIFRA. And again, the Supreme Court has relied on that provision positively. But even if we set that provision up. Is the land exchange here irreconcilable? Because the land exchange seemed to me to say you have to go in and consider the religious beliefs of the Indians. Why wouldn't we interpret that as consistent with RIFRA? And we basically adopt RIFRA through that exception. I think you're right, Judge Nelson. In the principle that Judge Collins was talking about, they're not irreconcilable. The claim here is the transfer must not occur. It's not that the transfer should occur in a different way. The transfer must not occur. And that is the one thing that 3003 decrees shall occur. But the transfer could occur if government satisfies strict scrutiny. It hasn't even made an attempt to satisfy strict scrutiny here. But the exceptions are not irreconcilable. This goes back to my original question, though. Why are we deciding it on the transfer? Why don't we allow the transfer to happen? And I think I know the answer now that I'm asking the question. And then look at the conditions. I mean, I guess the response is because at that point it's in private hands and that RIFRA wouldn't apply. So we have to address this all otherwise. In addition, page 314 of the final environmental impact statement says that walking immediately upon the land transfer public access is cut off. And access was something that existed in Navajo Nation and in LINC, and this would cut that off. Why don't we restrict that provision? Why don't we restrict that provision? Why don't we allow the land transfer to happen? I'm just trying to figure out how we can. I mean, this is a pretty broad injunction that's being requested. The rural court can still receive evidence, not exactly the scope of the injunction. The court doesn't have to decide that now. The court has to decide what is going to be the test for the substantial burden analysis. We have an injunction. We have to review it. The federal environmental impact statement also makes clear that this transfer is being done with the eye towards the destruction, but exactly the type of destruction that didn't happen in Navajo Nation. We don't even know if it's going to happen. They're going to do a study. I mean, can they come back and say this isn't going to work? I mean, I do have some questions that we'll get on this. Could this be restricted so that only half of this land is destroyed and not all of it? Your Honor, I see that my time is up. Would you like me to help you with a question? So it is possible that if a land transfer was done in a way where the private party is being instructed and will guarantee that access will continue and that the legislature side will be able to move forward, you can imagine a land transfer like that, hypothetically, that would impose a substantial burden. That's what the government is requiring. That's not what's going on here under the current government action and under the environmental effect statement that is envisioning the land transfer with an eye to the destruction that will make the religious exercise impossible. Thank you. Judge Gould, do you have any questions for counsel? Well, similar to my question earlier, what I want to know is whether a part or way for a treaty right could support the requested injunction. I think that the treaty rights and the government's obligation here are relevant and could also support an injunction, Your Honor. Thank you, Your Honor. We seek support on behalf of the Forest Service. This court is aware that this case is not about an agency action. It's about an act of Congress in which Congress can say the competing demands on a piece of property, balance of interest, and make a decision. It's decided that Apache Leaves shall be preserved for native uses, for religious and cultural uses, and it's decided that Oak Flat shall be transferred to Resolution Copper so that the third largest copper ore deposit in the world can be mined. Is the transfer condition tied into the use of the copper mine? It allows the copper mine, but does the Resolution mine, because it's landed in Seattle, we're not going to have a copper mine at all. We're going to build a resort. I don't believe it requires us to actually operate the mine. There are still many developmental steps that could happen after the transfer occurs, and if they were to decide it's not feasible to mine this, then they'd have to pay a little in the land. I would also add, though, that it would be restricted. Well, that doesn't mean that it's restricted, but the statute requires them. As a condition of convenience of the federal land, Resolution Copper shall agree to provide access to the surface of the Oak Flat campground to members of the public, including Indian tribes, to the maximum extent practical consistent with health and safety requirements until such time as the operation of the mine. You're saying that it does preserve some access? Yes, absolutely, until safety no longer allows it. Until the mine is gone? Until safety no longer allows it, because everything happens for us, right? Well, they mine it, and then it's gone. Right. Okay. Well, the access will end before subsidence occurs, because it wouldn't be safe to have people accessing the land when it could subside. The statute requires, and this is an unusual FEIS, because you talked about all the cultural and religious things, and I take it that's not a NEPA requirement. That's a statutory requirement here. Yeah, it's officially talked about those things as well, yeah. But the statute also says you have to accommodate the religion, but it's very vague. You would say the government has fulfilled that obligation. Well, actually, you probably haven't said anything, because you haven't done a new FEIS. Is that accurate? Right, and I should address your question before about what the status is. As we've informed the court in the past, the prediction is for that FEIS to be ready this spring. I'm afraid you didn't get it done, though. We just did it a few months, two years ago. These things generally take a long time. But the prediction still is that it will be ready this spring. We are under an obligation. There's no sense that they're waiting for a decision from us. No, that is not correct. There is a 60-day requirement. We have to get a 60-day notice of the issuance, and then the transfer must occur within 60 days of the issuance. So the actual issuance of the EIS, you know, if we had said spring, it should be shading over into early summer by the time that 60-day notice is given. But it is coming out in the near future, and so I do believe this case is judiciable. But since this is an act of Congress and it's Congress that's directed what must happen with this land, RFRA doesn't give this court the tools to nullify that statutory command. I have a question. I'm assuming that what you read, you know, the statutory provision says at the very end, the last one is that you shall transfer the land. Before that, it does require a lot of other things. It would be environmental review, coordinating with the tribes, trying to accommodate. But you don't, I'm assuming you don't read those earlier things as making it so that you wouldn't transfer land. You need to do all of those things in a way that would also allow you to do the last thing. Is that how the government does it? Right. The statute is called the Southeast Arizona Land Exchange and Consultation Act. Its purpose is to, I'm reading, to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the United States. So that is what the statute is about. There are some conditions, and those are set forth in the statute. But the statute requires the land transfer. Without the land transfer, the statute is nullified. And that is why it cannot be reconciled with Plaintiff's interpretation of reference. What do you respond to the question that Judge Berzahn asked your friend about the government's waiver? Well, we did reach this. It wasn't a footnote. It was a fairly long and substantial footnote. We agreed that part of the statute was rather short. Thank you, P.H.S. But I will say, Your Honor, the panel was down by, of course, decision in that the foundation was historically controlling. Once the court asked for briefing, the waiver should be taken in bank. We expanded on that argument in that supplemental briefing that the court requested, because, of course, as Judge Berzahn said, there's a fundamental difference here. I say this because someone was on the panel. It was somewhat blindsiding to have the whole discussion being about the question of substantial burden, and all of a sudden, you know, in the petition for a hearing proposition, there are pages and pages about the fact that it's really not a question here at all, because we had to put out completely different statutes and the relationship between them. And a rather complicated set of case law, which seems to run in both directions, frankly, because some of the case law does seem to support your position. On the other hand, there are two cases involving RFRA itself, in which the Supreme Court did apply the language that you're saying is not pertinent here. So it's a complicated question. It wasn't briefed to us. And should we be deciding it now, or at a minimum, should we decide it everywhere else? Should we decide it back to the panel to deal with, because the panel didn't deal with it, because it was not front and center at all? Well, the reason it wasn't front and center is because we didn't think the court needed to reach it, given the binding Navajo Nation decision at that stage of the proceedings. Now that that decision is no longer binding, I do think it is necessary to reach the issue, whether the court does it in bank or sends it back to the panel for that involvement. You're talking about Navajo Nation. Yes. Would you agree? In my view, the panel was bound by Navajo Nation and appropriately applied it. So the question is, is Navajo Nation, can we adopt that same rule here? It seems like that's plainly inconsistent with what the Supreme Court has subsequently said, that ART LUPA and RFRA have the same definition of substantial burden. So can we, I mean, can we go back and say, now that we're not bound by Navajo Nation, now that we have 15 years of Supreme Court presence, can we adopt the same rule and say, only Sherbert and Verner, in Yoder cases, are defined substantial burden for purposes of RFRA? Yes, I think that's absolutely substantial in the Supreme Court's subsequent jurisprudence. I don't even understand that to be your position, that Sherbert and Yoder are the only two examples. I mean, you have a broader position, which is correct. Our position is that coercion by the government is what is meant by a burden. And so Sherbert illustrates the indirect coercion, meaning denying an otherwise available benefit because of somebody's religious exercise. And Yoder illustrates direct coercion, when somebody was criminally fined for not sending their children to school past the age of 16, coercion without prevention. But that's the form of the book. Prevention is a broader word that often is used in cases that involve coercion. For example, in Yellow Bear, the Trump Circuit case, the word prevention was used, but so was the word flatly prohibit. In that case, the prison had to be happening here, wouldn't the destruction of old flatly prohibit the exercise? No, prohibit is different. Prohibit is the exercise of the government's coercive power to punish you or fine you, or to do something to the person, not something to the government property. And that is what has marked the difference between a burden and effect. I think that's where you were going. The First Amendment doesn't cover internal use of land. And I think the panel addressed that. But RFRA seems to have expanded that. And that's what I'm concerned about, is that RFRA, you know, it doesn't seem bound by these prior First Amendment cases, I believe. Okay, well, RFRA expanded, and the Supreme Court has been really clear on this, and RFRA itself is really clear on this. It expanded the type of government burdens to which strict scrutiny applies. It now applies to ones under a neutral and generally applicable law, where under Smith it did not. That is the change that RFRA made. It restored the rule before Smith so that burdens that are imposed by neutral and generally applicable laws still require strict scrutiny. But it didn't change the burden. Using substantial burden, it still has. It's unusual because substantial burden is used, and yet all these prior cases, they don't talk about substantial burden. Are we supposed to assume that undue burden that's used previously is the same thing as Congress said? Yes. And I'd like to give you three reasons why substantial burden means the exact same thing in RFRA as it does under the First Amendment. The first is, of course, in interpreting any statute, the first thing you do is look at the statutory text and interpret it using the standards of statute and the statutory instruction. So the statutory text indicates that the end of this word, burden, it doesn't say Congress shall not adversely impact. It does not say Congress shall not inspect. It's a somewhat unusual verb, burden, and uses that, and it gives no intent to change that. Congress is very clear in terms of what they are changing. They're changing whether neutral and generally applicable laws require strict scrutiny, but they never suggest that they're changing strict scrutiny, but it's changing the meaning of the word burden. Moreover, it is a well-established canon of statutory construction. So I agree with you on, I mean, if you're saying strict scrutiny, that's the compelling nature of the canon, and that seems to me to be where RFRA says we're going to look to Yoder and we're going to look to Scherber. But then it says and also cannot impose a significant burden on religion, and it's that and that is unusual. That doesn't tie itself to prior case law. But it does. Both Yoder and Scherber use the word burden. Now, admittedly, they didn't use substantial burden. Significant, significant. I mean, when Congress uses significant, aren't we bound to look at whether significant has a different meaning? Why didn't they use the language that the Supreme Court cases use? Well, again, I think it's very important to look at Hobby Lobby and Whole Persons Hub, in both of which the Supreme Court described Scherber in Yoder as imposing a substantial burden test. So they obviously thought of it the same way. So, yeah. Judge Nelson is saying, I mean, this sentence here statistically does not rely on Scherber in Yoder. It's an act to guarantee the application in all cases where free exercise of religion is substantially burdened. So there are two things it's saying. One is to restore the compelling interest test as set for Scherber and Yoder. And secondly, to guarantee its application as a compelling interest test in all cases where free exercise of religion is substantially burdened. So the substantial burden test is not tied to Scherber and Wisconsin. You can make a separate argument that it's somehow implicitly tied to the prior case law, but it's certainly not tied directly to the statutory language to Scherber and Yoder. That is a part of the reason it didn't change from the previous law. The change from Smith was making the compelling interest test applicable to burdens, an unchanged term from the prior case law, that are generated by neutral and generally applicable laws. And it said, if the law is neutral, you don't have to apply strict scrutiny. And Ripper said, yes, you do. But it didn't change it. There has to be a burden of the nature of the Supreme Court. They recognize it. It actually now says that any substantial burden triggers strict scrutiny. And maybe that's a change from the prior case law because there's a lot of language in Ling which doesn't apply strict scrutiny that seems to acknowledge that the burden is substantial because, you know, the court at one point describes it, that they will assume that building the road will virtually destroy the Indians' ability to practice their religion. And so maybe it is a change in the law from Ling, and it's just not a codification of everything that went before Smith. No. Yeah, I don't know to what extent the court is willing to look at legislative history, but if you are, the legislative history of Ripper is explicit that they were not overturning Bowen and Ling. That's cited in the brief. I would also point the court to Professor Douglas Laycock's article Interpreting the Religious Freedom Restoration Act, which was written one year after it was enacted in 1994. He was one of the principal experts Congress relied upon.  The government does not prohibit the free exercise of religion unless it regulates or penalizes a religious practice that is generally unaffected by RFRA. Do you agree that, as a colleague just said, under RFRA it covers all substantial burdens, but do you agree that it covers all substantial burdens? If that's what you mean by the word burden, the way you're either using it earlier to include a fact, then no. It doesn't include a substantial effect. The law says substantial burdens imposed by laws or governments are not substantial burdens. That's what RFRA says. It seems to me like in some ways all this focus on substantial burdens sort of loses sight of the fact that nothing can be a very substantial burden. Bowen versus Roy, right? And it doesn't actually count as the type of burden. And we know that has to be true because, you know, the government does not have to give me $10,000 and I can get around the middle of that, the other side of it, but they don't have to give me $10,000 to build my church if I have no other means of doing it, and it's really important to me. That would be a substantial burden if the government's not giving me $10,000, but it's not a burden being posed by the government, right? It would be the way. So why isn't that the better way to look at this? Is this the kind of burden imposed by the government to be covered by RFRA? Well, you could look at it that way, but, you know, if you look at it in the other way, it opens you up to the area of how can this not be a substantial burden? You're making a whole lot of mistakes here. Because of what this court correctly held in that foundation, which is completely consistent with all of the Supreme Court case law, which is that RFRA is a term of art actually, and we're just thinking about that we decided, and I understand that you're recasting it so that it isn't simply the two particular kinds of burdens that were in Yoder and Sherbert, but a sort of broader and more abstract concept. If there are other forms of coercion, then I keep thinking that foundation, which says completely specifically only what was in Yoder and Sherbert and all the penalties, and this is where we have to disagree with the other side on the interpretation of what does it mean, and, of course, is any burden short of that? We think other forms of coercion, government coercive actions, as we are likely to discuss evident domain, for example. If we exercise evident domain, we take somebody's property from them without their consent. That is the exercise of government coercion against a person's property, and we would concede that that would be a substantial burden. And I do think Navajo Nation leaves room for that in that discussion, but it does not mean that the effect is big. The effect was huge in Lincoln. It was catastrophic in Lincoln and Navajo Nation. It was a substantial burden. Yes, the court did use the word burden actually. Those respondents contend that the burden on the religious practices is heavy enough to violate the Cree exercise clause. Like I said, it wasn't the employment department. You look back on the employment department versus Smith, what it actually says about Linc. What it says about Linc is that it was essentially an application of the mutual rule test that applied, which was made more specific in Smith. Well, one of the many criticisms of Smith is that it does not very accurately deal with prior precedent, and if that's what it said about Linc, then I think it could characterize it. Sure, but the Supreme Court has continued to cite Linc and to apply Linc for different principles. Now, I'm quoting directly from Linc. It is not just about neutrality. It says the use of the land is likely to be a social security number in Roy, because in both cases the challenged government action would interfere significantly, so there is that effect, would interfere significantly with the person's ability to pursue their religious beliefs. But in neither case would the affected individuals be coerced by the government's action into violating their religious beliefs. Nor would the government action penalize religious activities by denying an otherwise available benefit. That is the same thing as the extent of omission. Do you agree? Is it your position that the phrase substantial burden has a different meaning in RFRA than it has in RILUPA? No. We think across all three fields of religious liberty law, RILUPA, RFRA, and the First Amendment, substantial burden means that the two counts have to be coerced. But that can't be squared with what we did in the elimination. Because we've clearly, in the name circle, we've clearly defined RFRA and RILUPA as having different standards. And that's a problem that I have. So help me out here. I think that RILUPA, and I think you just answered it, but if I believe that RILUPA and RFRA impose the same standards, how does the government win here? If we jettison the Navajo Nation test, give me a best argument for why the government still wins under an RFRA and RILUPA substantial burden analysis. Okay. Because in RILUPA cases, well, first of all, I would also add that when RILUPA was enacted, the legislative history of that one explicitly states that they didn't define substantial burden on purpose because they wanted courts to look at prior cases. No, no, no. I think across all three sources of religious liberty rights, a burden means the thing the government is doing to the plaintiff, not to its own land or not to internal processes with applying a social security number to them. I agree. That's what means. Right. And that's what burden means in every single case, with the single exception of the unpublished district court case in the 10th Circuit Convention Nation. It was wrongly decided. We do. And, moreover, Professor Barkley's article recognizes that he describes it as the only case that got it right, unlike Lange and Navajo Nation and every other presidential case out there. That's their opinion that that's right. It's wrong. Are there any other examples when government property is being used? The example that was brought up in Liz Jean's shares of me at this point was the A-Rules, the Jewish A-Rules where they set boundaries for Shabbat. Have there been any? I was looking for cases on that, and I couldn't find any. Are there any cases on that that you're aware of? The only case I'm aware of is the Tennessee one, and that was a case of when you don't enforce it against everybody, there was evident inconsistent enforcement, and so that's the principle. I have a question based on a statement that I think you made, and I'd like to have you clear it up if you could. Is the government's position that the term substantially burdened in RFRA has the same content and meaning as it has in RUPA and in other statements? Because I noticed that there are two phrases in RFRA, in A-1 and B-5, that specifically mention prior federal cases in Yoder and Shabbat, and those references do not exist in RUPA. Is the government's position that substantial burden means the same thing, has the same content, in RUPA as it does in RFRA? The case line has gone in two different directions because of the very narrow set of circumstances in which RUPA cases can be brought. There's only two circumstances. So you either have to be an incarcerated person, in which case the government controls everything about your life, and if you can't exercise your religion, this is one way of saying there's almost always a burden present if you're a prisoner, because if you can't exercise your religion, it's because the government has locked you up and you can't go do it. But their argument is that we need to analogize that in the same way here, that they are, and I'm not sure whether it carries a ban or not, but I want to hear your response, that the Indians, that the Apache tribe here is, in some ways, beholden to the government for access to their religious practice. So why isn't that similar to the prison context? It's different because in the prison context and in the RUPA land use category, the coercion is directed at the person or at the religious organization that owns property that, due to zoning rules, they're not allowed to use the way they see fit. That's true. It doesn't say to test the burden of the person. It says to test the burden of the person's exercise. Well, it also says application of the burden to the person, and moreover, in Hobby Lobby, this word emphasizes the word person a lot in reference. It has always been. There is no case where this has not been the case, where it is the burden that the person imposes on the plaintiff. The restriction on their liberty or their use of their property is the burden under all three sources of That's on a different subject than what Judge Gould has been asking about the treaty. I gather that your position is that the treaty is essentially not enforceable against the government. This particular treaty is just a peace treaty. It doesn't settle any rights of land. It doesn't create any land rights. My question is whether we thought that the treaty had any relevance here, given yesterday's argument in the Supreme Court in another nomination case, about the enforceability of judicial rewrites against the government. Would we have to wait for that case? No. The principles in this case are so well settled that they can't be affected by the decision in that case. It's black-letter law that trust rights have to express rights creating language in a statute or in a treaty. I didn't have that issue in the case that was argued yesterday. Why just in that case did the government sort of agree that there were fiduciary rights, but it says they're unenforceable? Well, all I can say is that to apply a different principle in this case would be revolutionary. Treaty language like this, it just says it doesn't convey any rights. It doesn't take land into trust. It doesn't settle boundaries. It's just a peace treaty. It doesn't create the specific rights creating or enforceable language that counsel. Judge Gould, if I could ask you a question on that point. I thought a clause in the treaty called on the government to pass and execute laws that are conducive to the happiness and prosperity of the tribe. If that's true, it doesn't destroy their sacred mountain or treaty in a way. Go against that. Your Honor, very general language like that has been held by the Supreme Court in, I believe, another of the negotiation states to not create enforceable rights. So, no, that cannot be used to create a right here. And I'd like to just point out that neither does that treaty create any use of fiduciary rights, and neither does Executive Order 13007. Executive Order 13007 requires that the agencies, to be explicitly practicable and permitted by law, preserve sacred sites. And I'm skipping over a lot of caveats, but two things about that. One, the order explicitly states that it is intended to improve the internal benefits of the executive branch and is not intended to, nor does it create any right, benefit, or responsibility, substantive or procedural, enforceable by law by any party against the United States. So, it can't create a use of fiduciary rights, and neither does this treaty. Now, next question. I have a question about something short of the treaty. I think you're probably right that there's not a trust relationship here, but they do seem to be in a different situation than the general public has to this land. Is there any sort of differentiation that we should give to that in determining whether RFRA has been violated? No. RFRA doesn't give its court, or any court, the power to decide categories of people that are entitled to more than what RFRA provides. Congress did take that history into account. And, in fact, at the time that RFRA was enacted, there was another piece of legislation being considered that would have addressed other issues with Native American religious exercise and the First Amendment. Unfortunately, that legislation never became law, but RFRA, only Congress can provide that relief, and RFRA doesn't give its court the power to make distinctions between Native Americans and other people when it comes to the use of government resources. Mr. Haslund, that's cool to me. On my concern about the treaty here, you said that there was Supreme Court precedent saying that the general language about passing laws conducive to happiness and prosperity of the tribe was not enforceable under some Supreme Court precedent. But you did not give us any citation or mention a case name. So could you please provide citations to the clerk of the court, unless you're prepared to mention them now? I do know that they are cited in our brief, but I'd be happy to put the citations in the letter of the court. I'm afraid I cannot, because I don't know. I just have a question. I'm sorry, but I'm just going to back up, because I just want to understand. Is it your view that we have to define substantial burden to resolve this case? The court would not need to address that issue if it were to decide that the Southeast Arizona Land Exchange Act overrides the record, even if they were in conflict, because as the Supreme Court held and endorsed the fact for a decision that the justices were 9-0 on this point, including four justices that were in the majority in Hoppy Loppy, that there is no magic password. An earlier statute saying there must be an express reference cannot preempt it and would stop a later Congress from repealing it by plain import or implication as it chooses. I don't know if it was introduced in the Supreme Court. Sure. I'm happy to get a chance to address those. In Bostock, it was – okay. The other one then is the Hoppy Loppy. They have a footnote where the dissent had urged that Congress had considered, or the dissent had considered an amendment, and then that would have provided the relief that was argued for in court, but didn't enact it. And so it was making an influence from that unenacted provision that Congress didn't intend to provide exceptions. And when the Supreme Court cited this provision of RFRA for the proposition that unenacted legislative history was not enough to override that presumption in RFRA, RFRA generally requires exemptions from subsequent laws. That's what RFRA does, generally applicable and neutral laws. Okay. It certainly was premised on the notion that the statute was pertinent as to the clear statement rule was not enough. Yes, but it can't amount to a full thing. It would be the elephant in the mouthful of a kid, and I think would prevent the Court from saying that this footnote represents a reversal of the Supreme Court's 9-0. Well, fast forward, but everybody agreeing on the principle. The decision endorses the particular statute on the ground. Right. And in this case, on their interpretation of RFRA, the Southeast Arizona Land Exchange Act is irreconcilable with their interpretation of RFRA, and so the Court has to decide, well, give Congress an enacting this land exchange statute. I guess it's irreconcilable. That's not our theory. Oh, okay. I think you're saying you don't think it's irreconcilable. No, no. Because we think that burden is a term of art brought forward from previous case law, and it requires that the government be doing something about it. We do need to reach this question, is it irreconcilable? Because, I mean, the statute, the land exchange statute, specifically says you have to take consideration of religious rights, and so why wouldn't that be, why wouldn't they interpret that as saying, I mean, this is not irreconcilable with RFRA, and that exception actually should be read consistent in embodying RFRA? I think the fact that the statute clearly did consider religious uses of the land cuts the other way shows that Congress was aware of it. They held hearings over years because this legislation came before Congress for several years before it was ultimately enacted. And they held hearings, and they were aware of the competing demands for the use of property, and they provided for those religious and cultural uses to be taken into account by setting aside Apache Leap, by requiring that the condition of the exchange for resolution property to render its rights to mine under Apache Leap. But they also provided that Oak Flat must be transferred. And with respect to that, it did not. They didn't allow some religious accommodation even within Oak Flat. I thought there were a whole bunch of plans that were transferred and things like that. Yes, yes, but what it doesn't give the Forest Service the power to do is not to transfer it. After the consultation, the Forest Service is supposed to negotiate with Resolution Copper for a mutually agreeable way. The Forest Service, before it transfers it, say, you know what, you can only mine on half of this. I don't even know if that's technically feasible to do, but could the Forest Service actually do that? You know, given the number of times the statute said as a condition of the transfer, the fact that it doesn't say so. Can you contemplate them being able to mine the entire? I mean, not Apache Leap, but yes. Right, right, right. I mean, of this area, which, I mean, it's like a 95% overlay with the claim, you know, that we're looking at. With the current, yes. I mean, in the earlier hearings, other areas were also recognized as sacred. But the practice of this litigation is a black. And, yes. I heard you just, in the course of your answer, change the answer from where you had started. I thought you had said that in response to the chief's question, that you wouldn't need to reach the meaning of substantial burden if we held that under a Dorsey type theory, that there was a conflict and an overroad. But then I thought you changed the answer to say you can only find the conflict if you find that there was a substantial burden. I think that's what I meant to say. I think what I meant to say is the court could say, even assuming that it would be a conflict with RFRA, a conflict with RFRA cannot stop this land exchange from going forward because it is commanded by a subsequent statute and under a binding Supreme Court precedent, the later and more specific statute controls it. You're out of time. I have a terrific concluding statement. Thank you very much. The last point I would just like to make is Professor Barkley has suggested that this wouldn't be a big deal because other environmental laws already subject the government's land use actions to judicial review, which is undoubtedly true. But in those cases when a person says the use of this land, the government's use of this land interferes with my recreational, spiritual, and aesthetic enjoyment of this property, that gets them standing. They still need to prove that the government has violated NEPA or NIFMA or FLIPMA or any of the other Clean Water Act, any of the other statutes. But the main decision that we're arguing for here would be that anybody who can say this area impacts my religious exercise, not the term burden that the statute used, which has a history and a meaning. It brings the roots of the old soil with it. But just any effect on my religious exercise would look straight to strict scrutiny for every third-way land action, whether or not there's a predominant limit, strict scrutiny to actions that are central to our religion, to actions that are compelled, as long as there's an impact. So you could have the scenario that you described, Your Honor, where somebody says, look at that, I don't see how you can distinguish if somebody says I need to build a church on this land or I'll go to hell. That is effectively the rule that they're arguing for here. The government would have to at least satisfy strict scrutiny on that. And that is a very, very broad rule that they're asking for here. Public land or private land? I'm sorry? It's either public land or private land. Either. But they admit it, that they can't do that with public land. And for the same reason, a right to use government land as an individual sees fit has never been recognized as being a Supreme Court-positive veto, just like this Court did in Navajo Nation. It's never been recognized that a person's religious liberty rights include the right to tell the government what it may or may not do with its property, especially in this case where what the government is doing is transferring it. It's disposal of property, as Congress says, under federal power under the Constitution to do. So do you think it would make any difference if government itself was building the mine and plumbing up the land? Well, it would be an agency action. I mean, it depends if it was like the case where Congress dictated exactly how it has to go. That's a different issue. No, that would not be different. I mean, well, some of the things that are going to happen later are not government actions, right? And so that's a different aspect. You're saying it's just transfer, but if it wasn't just transfer, if the government was actually doing the act that was going to eliminate the site for the purposes of the religion, would that make a difference as a substantial burden? Well, that was the case in Ling, and the Supreme Court held that actions that do not coerce the plaintiff are not the kind of actions that have fallen under the protection of the plaintiff. Thank you very much. Thank you. Good morning, and may it please the Court. David DeVold on behalf of a group of private sector amici. Plaintiff's proposed rule here would erect huge and insurmountable obstacles to the sale or exchange of government land to private parties, and that's a power that Congress has. Under Article IV's property clause, which the Supreme Court has repeatedly said is without limitations, the damage to private enterprise would be profound if a purchaser of federal property could only use that property later as if it were the federal government, and that is the rule that is being argued for here, although not in so many words. It doesn't matter whether it were the federal government. According to the federal government, the federal government could do the same thing anyway, with regard to the mine. Our position is that under Ling, that even if the government itself were to take action to restrict access to its own land, it would not implicate either RCRA or the First Amendment. But the case is even easier when the government is making a decision to sell its land outright. In the establishment law clause context, also under the First Amendment, several justices in courts have recognized that the solution to a First Amendment problem is for the government to sell or give away land where some alleged constitutional violation is based, and this is certainly no different. The government would be giving an exchange, a fair value exchange, its property to a private entity. That private entity is going to take years of further analysis and development to decide whether it even goes forward with the mine, and if so, whether that mine will impact such things as the open flat campground. Is it possible that the mine ultimately would not cover that entire area? Yes. In fact, let me back up. Over the course of the pre-legislation and then post-legislation process, the amount of land that will be impacted by this copper mine has reduced significantly, and to the point where in the materials that are included with the FEIS, the one that was withdrawn, it points out that the subsidence may, in fact, never even affect the campground. And I'm not putting this up to say that we have to argue this case on different facts. I bring it up to emphasize the point that we are talking about putting a restriction on what the federal government can do based on private action, non-state action, that may occur in this case years later. If that's true, it actually sort of cuts the other way on the Dorsey argument, because that says, well, maybe there's a way to do this that you could tailor it, and so maybe there isn't a direct conflict between the transfer and reference, and maybe reference says you need to pick the way that preserves this. The points I'm making are about whether it's feasible for the mining company to actually do the mining and to what extent it does it after it becomes its own private property. Why wouldn't the mining company just say, well, preserve the campground? Wouldn't that resolve this litigation, and you'd get 90% of what you want? Well, I don't think it would resolve the litigation because they've said this is not just about the campground. There wasn't this requirement to accommodate religion. Can you address that? Because LEAN did rely on some of the actions that were being taken to accommodate religion, so I'd like to know what's being done here. Sure. The reference you make to LEAN, the court said, although the government has the power to do what it wants with its own land, it should be solicitous to the interests of Native Americans. By the way, is that a fine? I mean, it's an odd statement in LEAN because it's like even if LEAN were destroyed, I'm not sure that it would have come out differently. It's almost like they said that in a way to sort of make themselves feel better about the rule that they were done. Unfortunately, we are in the position where if we roll for the government, we have to feel really bad about what we're doing because there's a possibility this is completely destroyed. Well, so you asked about what things have been done. Even before the Act was enacted, there were a number of compromises made to reduce the size of the acreage that would be affected. It went down by nearly 1,000 acres. After the Act went into effect and during the EIS process, this resolution agreed to forego about a half a billion tons, a total of almost 2 billion tons of ore that will not be accessed during the mining process in order to reduce the footprint of the subsidence. There was a way specifically to accommodate the religious beliefs, to carry out what the statute requires, which is for the secretary to work with both sides, try to come up with mutually agreeable solutions. By the way, that's an area where the statute gives discretion to the secretary to take certain actions. And as we pointed out before, when he gets to the end of that process, he has no discretion. That's the conflict. And that's when the new FEIS comes out. Right. When the new FEIS comes out, 60 days later, the land has to be exchanged. We're being asked to decide whether to approve the land exchange, and we don't even know what the final proposal is. What if the new FEIS said, hey, we're going to reduce the footprint by 50%? I don't know that it would change what the plaintiffs are arguing here. But, you know, because they've sought an injunction to stop the land exchange no matter what. That's what they sought. They filed their law. And I think that's very problematic. I mean, I've got to be honest. I'm more interested in what these conditions are, and I don't feel like I have enough before me to decide this. Because if the mining company came in and said, well, that's nice, you know, we're not going to do any of that, and the government still approved it, I think that's a different case, potentially, than if, you know, the mining company comes in and says, hey, we're really going to accommodate within reason what we can do here. I agree it's a different case in terms of different set of facts, but I think it reinforces the point I made a minute ago, which is that what we're talking about is deciding whether or not the government can take an action, a binary action, either keep the land or sell it. Based on our predictions, our fears, our wondering about how a private party will eventually use that land years and years from now. But the ACIS, at least, is about how the land is going to be used, right? Yes. It's not just about the transfer. There are a number of permits and approvals that are required even after the land transfer, and the statute specifically says in order to guide the agencies who will have to make those decisions about permits because some of this activity will still go across or affect land that will remain in the federal government's hands. For all those reasons, Congress wanted a single EIS prepared in advance of the land exchange so that there would be, number one, better visibility into what the effects might be, and number two, to help guide what those future decisions would be. And as I said, it helped in the process by reducing the impact. It also caused, most significantly, a new alternative to be proposed by the Forest Service that will require the tailings, the waste from the mine process, to be transported in a different manner to avoid affecting other areas of this larger piece of land. How does the condition reduce the impact when, as my understanding is, the impact is still that the whole area is going to disappear? First of all, the subsidence, which will occur gradually over a course of 30 years, will have a smaller footprint as a result of the accommodations that were made, both pre-enactment and post-enactment. But does a small footprint eliminate any of the area that the patches are claiming, or say they're a sacred area? Well, part of the problem is you have to have the land exchange occur before the company can finish up its exploratory efforts before it even starts building the mine. And as part of those efforts, and this is in the withdrawn FDIS materials, the company had already made decisions to reduce the amount of ore. That reflected at page 21 of Apache's brief. There's a map. Is that still the map that we should be looking at for purposes of determining what the impact would be? It's a general matter, but the size of that circle eludes the concessions that were already made. The size of the circle you're looking at is the entirety of the Oak Flat withdrawal area. And what I'm saying is we won't know until after the exchange occurs and after further exploration is done how much of that area will actually be affected by the subsidence. I'm not here telling you that there won't be a significant subsidence. I don't want to be misunderstood. My point is we're talking about – Does any of that matter? Because do the conditions include a right of access to the Apache, even if there's land for them to access? Yes, it includes a right for them to access after the exchange to the campground area. Even after the mine is built, there is a potential for them to still have access. There's a mitigation plan related to the subsidence that acknowledges that there is a possibility that even the campground will be spared. But if it's not, even that is going to be literally decades away. As the process of building this mine takes shape after the land exchange. And I get into all these details, again, to emphasize that what you're being asked to do is to consider a rule by which the government's decision whether to sell land is going to depend on whether some private action, potentially years down the road, will do something that if the private actor were the government, it couldn't do. And that is not how the law operates. And I haven't seen any – I'm with you except for the fact that Congress stepped in here and actually defined how this was supposed to be done and that the combinations were supposed to be made. But that's different than if the government just went out and sold this on the open market. That doesn't turn into state action. We cite a number of cases in our brief at pages 12 to 16 about how significant government involvement and approval of and even complete funding of a project does not turn it into state action. And that's what we're dealing with here. This is a significant threat to the line between private action and state action if you follow through on the logic of what the plaintiff is asking you to do here. So I think I'm out of time. Thank you very much. Thank you very much. I'll give you three minutes. Thank you, Your Honor. When we started this case, the government swore up and down there are only two categories of government action that could ever qualify as a substantial burden, imposition of penalties or denial of benefits. On my count, we now have at least four exceptions to that rule. One is coercion in prison. The government admits that that's a substantial burden even if it doesn't fit the two categories. Adopting cases counts as a substantial burden under the quasi-property rights theory. The destruction of personal property counts. And the eminent domain destruction of real property rights counts. We're now up to a six-category theory from the government. One category that is missing is use of government property. And we've got the Comanche case. I mean, that's where we're struggling. Yes, because you can add up all these different categories, but I'm not sure the category you need is encompassed there. Yes, it's gerrymandered to exclude one particular category. Well, I think that's a little bit of an overstatement. I mean, it's not gerrymandered. And if it is, it's gerrymandered by the Supreme Court. We would disagree, Your Honor. The analogy to prison is government property. It's internal government affairs. And the Supreme Court has recognized when the government manages that property in a way that prevents religious exercise, that's a substantial burden. The government tries to rationalize all this by lumping it under the category of coercion, specifically coercion of the person. Referent doesn't say coercion. It doesn't say prohibit. It says substantially burden. And it doesn't say burden of the person. It says substantially burden of a person's religious exercise. And even if you take coercion as a necessary requisite for a substantial burden, what is coercion? The government hasn't defined it, but it's the use of government power to stop you from doing something you want to do or to make you do something you don't want to do. And here we have coercion in spades. Right now the plaintiffs can go on to Oak Flat, access it, and use it for their religious purposes. If they were fined for doing that, the government would agree that's a substantial burden. If they were physically restrained from doing that, just arrested and handcuffed and stopped from going there, the government admits that would be a substantial burden. Here it's worse. That is the baseline. And how does that drive the analysis? Because in much media, for example, this was government property, but it was not open to the public. You wouldn't have the same argument, right? What if this was, you know, the Pentagon building or something, and there was some tribe that had the center of the Pentagon building as its favorite spot? Presumably you wouldn't make the same argument, would you? Correct. That would fail both on substantial burden and on streets. Why? Therefore, the prior access has to be all-important, and unless there is an all-important. It doesn't necessarily have to be all-important, but I do think the term burden is a relative term. It requires some sort of comparison to what went before. And sometimes the status quo ante is the proper baseline. But here the baseline question is easy. Whether you go back to the time when they were forced off the land or you just look at it right now, the baseline is they can go onto the flat and access it, and that's being taken away, and that's a substantial burden. I think the core of the government's argument is not really textual and not really presidential. It's really a policy argument. It's about we, the government, need to be free to do what we want with our own land. I didn't know you were over, but the Supreme Court said it's not like they're making that up. The Supreme Court said that in the link. They said those very words. And the question, I think, that I kind of grapple with is does RFRA change that link analysis? Yes. And I would love just one minute to speak to that. You might only get ten seconds. Okay. Well, that policy argument that if we apply strict scrutiny across the entire range of government operations or even just government on land, that would unleash chaos. That is precisely the argument made in Employment Division v. Smith for rejecting the burden-shifting framework, and that is precisely the policy argument that Congress rejected in enacting RFRA, and it told courts don't be scared of strict scrutiny. It's a workable test for striking sensible balances. We have 30 years of experience applying that test. It has proven workable, and it's a test the government hasn't even tried to satisfy here. So the district court should be reversed. Thank you. Thank you. And now we land over time, but this is very important issues that we're trying to resolve here, and I appreciate the extra effort that everybody put in to this case and to these matters. So Mr. Goodrich, Ms. Barclay, or Hope Barclay, Ms. Peppin, and Mr. Diebel, thank you very much for your presentations here today. The case of Apache Stronghold v. United States of America is now submitted. Thank you. We'll be adjourned.
judges: MURGUIA, GOULD, BERZON, BEA, BENNETT, NELSON, COLLINS, LEE, FORREST, VANDYKE, MENDOZA